UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHAEL CARTER, as Trustee of the :          CIVIL ACTION NO.
SFSK Dependent Trust,            :
                                 :
                  Plaintiff,     :          3:06-CV-1351 (HBF)
                                 :
         vs.                     :
                                 :
                                 :
CHRISTINE MARBURG WOLF.          :
                                 :
                  Defendant.     :

BENCH RULING

Plaintiff Samuel Verkaik, the trustee for the SFSK Dependent Trust, filed this diversity action on August 30, 2006 against defendant Christine Wolf. It arises out of a dispute over a residential lease and alleges seven counts[1] against defendant for breach of contract with regard to unpaid rent; breach of contract with regard to unauthorized modifications to the premises; breach of contract with regard to damage to the property; breach of contract with regard to the loss of personal property; breach of contract with regard to additional lease violations; conversion, and intentional tort.[2]  Plaintiff seeks compensatory and punitive damages and attorney's fees pursuant to § 13 of the Lease.

_____

[1] Plaintiff withdrew the Eighth Count alleging conspiracy.
[2] At trial and in post-trial briefs, plaintiff asserted a claim for lost rental income of over $800,000 following the tenancy. However, plaintiff never alleged this claim with particularity in its Amended Complaint. Therefore, any damages

Defendant asserts a number of affirmative defenses and asserts six counterclaims for breach of contract related to the security deposit, violation of Conn. Gen. Stat. § 47a-21(d)(1), (h)(1) and (h)(4) with regard to placing the security deposit into an escrow account; violation of Conn. Gen. Stat. § 47a-21(d)(2) with regard to the return of the security deposit plus accrued interest; and violation of CUTPA related to actions surrounding the deposit and return of the security deposit.[3] Defendant also seeks compensatory damages, punitive damages, costs and attorney's fees.[4]

A court trial was held January 23 through January 27, and February 6, 2012, during which the following witnesses testified: Gary Ryder, Stephen Archino, Evan Snapper, Christine Wolf, Richard DeBeradinis, Eric Sweet, Alexandra Dolger, Mark Bebey and Steve Correl. The testimony and evidence adduced at the trial are summarized below as necessary to explain the Court's findings and conclusions.

For the reasons that follow, the Court finds for the plaintiff in the amount of $188,096.60.

---

awarded for lost rent would have to be incidental to an alleged breach of the Lease.
    [3] Defendant is not pursuing damages with regard to her sixth counterclaim on lack of maintenance and repairs. [doc. # 224, Tr. 2/6/2012, Goldberg closing, at 217-218].
    [4] The parties reserved on the issue of attorney's fees.

I.     FINDINGS OF FACT

    *a. The Property*

       1.   The property at issue is a residential property located at 345 Round Hill Road in Greenwich, CT ("the property", "the premises" or "the home"), purchased by the SFSK Dependent Trust in the Fall of 2000.

       2.   The SFSK Trust was established by Gary Ryder for the benefit of his dependent children.

       3.   Ryder and his family lived at the property until the summer of 2004, at which time the family moved and the property was listed for rent.

       4.   The property was listed for rent by Steven Archino of William Pitt Realty on October 24, 2004.

       5.   At the direction of Steven Archino, photos of the premises were taken in September, October and December 2004, which represent the condition of the property when it was rented to Wolf. [Ex. 1].

       6.   The property was shown to five families and at least three offers to rent were received. [Exs. 3, 4].

       7.   Ryder decided to lease the property to Christine Wolf, through her agents, Evan Snapper and Sally O'Brien.

       8.   Ryder carried a Home Warranty for the property with American Home Shield. The warranty was in effect from July 1, 2004 through July 1, 2005. [Ex. 5].

9.   At the request of Wolf, the property was leased unfurnished.

10.   On or about December 7, 2004, the Trust, as landlord, and Wolf, as tenant, entered into a residential lease (the "Lease") for the property at 345 Round Hill Road, Greenwich. A true and complete copy of the Lease, consisting of a lease and a lease rider/addendum, is marked as plaintiff's exhibit # 7. [Stip. ¶ 1].

11.   The Lease, dated December 7, 2004, was prepared by Ryder's broker.

12.   The initial Lease term was for a period of one year commencing January 1, 2005, with a monthly rental of $14,000. [Stip. ¶ 2].

13.   The Lease was executed by Steven Scheno, who then was trustee of the SFSK Trust, on behalf of landlord, and by Evan Snapper on behalf of Wolf. Snapper duly executed the Lease (including the Lease Rider/Addendum) as attorney in fact for Wolf. The Lease was valid at the time of its execution, was validly executed by the respective representatives of landlord and Wolf, and the Parties were bound by the terms of the Lease. [Stip. ¶ 3].

14.   Pursuant to the Lease, Wolf delivered to the landlord a check for the security deposit in the amount of $28,000. A copy of the check is marked as plaintiff's exhibit # 8. [Stip. ¶ 4].

-4-

15.   The landlord deposited the security deposit into a bank account in the name of the Trust, which was not a segregated, interest-bearing account. Plaintiff's exhibit # 40 contains an account statement for the Trust's bank account for the month of December 2004. [Stip. ¶ 5].

16.   At the time the Lease was entered into, Steven Scheno was trustee of the Trust. At some point on or before March 2006, Michael Carter was appointed trustee in lieu of Scheno. [Stip. ¶ 14].

17.   Samuel Verkaik is the proper party plaintiff as the current trustee of the Trust. [Stip. ¶ 20].

*b. The Lease*

18.   The Lease was for a period of one year beginning on January 1, 2005 and ending December 31, 2005. [Ex. 7].

19.   Tenant agreed to pay, and did pay, a security deposit in the amount of $28,000. Landlord agreed to "deposit the Security Deposit in an escrow account in a financial institution" and to "hold the Security Deposit in accordance with the provisions of § 47a-21 of the Connecticut General Statutes, as amended." [Ex. 7, § 7].

20.   Under the Lease, tenant's duties included, among other things:

-5-

(a)   to not willfully or negligently destroy, deface, damage, impair or remove any part of the Dwelling or permit anyone else to do so. [Ex. 7, § 4(f)].

(b)   to maintain the grounds, shrubbery and trees in a neat and orderly condition. [Ex. 7, § 4(h)].

(c)   to keep the Dwelling in good condition and pay the first $100 of any cost for each repair of the fixtures, the kitchen equipment and other appliances, unless such repair is due to a condition existing on the date of this Lease. [Ex. 7, § 4(i)].

21.  Under the Lease, landlord was responsible for, among other things, paying for the lawn and grounds maintenance and for the opening and closing of the pool. [Ex. 7, § 3(f), 3(k)].

22.  The Lease provided that the tenant could not make alterations or additions to the dwelling without the landlord's permission. However, the Lease Rider/Addendum allowed tenant to repaint rooms as desired, with written permission from the landlord. The Rider stated that,

> Approval will not be unreasonably withheld. A letter stating which room(s) and what finishes is all that needs to be supplied. Landlord does not require 'color swatches' and will not in a manner inhibit color choices as desired by tenant. Tenant is responsible for the restoration, at their sole expense, back to original finish or color prior to expiration of the lease.

> [Ex. 7, § 10(a); Lease Rider/Addendum at 1].

-6-

23.   Under the Lease, landlord was responsible for all lawn and grounds maintenance. The only exception was that tenant was required to sweep off the boxwood hedges after any snowstorm. [Ex. 7, § 3(f); Lease Rider/Addendum at 2].

24.   Under § 10 of Lease, the tenant could not do the following without the prior written consent of the landlord: make any alterations or additions to the dwelling; drive nails into floors, walls or ceilings; change the locks; paint or wallpaper the premises; and remove smoke or fire detectors or security systems or make them inoperable. [Ex. 7, § 10].

25.   With regard to holding over, § 9 of the Lease provides that,

   (a)   the tenant has no right to remain in the Dwelling after the Lease ends,

   (b)   holding over by the tenant does not renew the Lease without the landlord's written consent, and,

   (c)   if the tenant remains in the Dwelling without the landlord's written consent past the term of the Lease, the landlord may, at his option, (i) elect to treat tenant as one who has not removed at the end of the term and shall be entitled to all the remedies against the tenant as provided by law, or (ii) elect to construe such holding over as a month to month,  subject to the terms of the Lease, except that the monthly rent will be two times the monthly rent.

-7-

26.   Under § 12 of the Lease, landlord can end the Lease and take possession of the Dwelling if any of the following occur:

(a)   Monthly Rent is not timely paid,

(b)   Tenant fails to keep any promises made in the Lease, and

(c)   Tenant moves out of the Dwelling before the end of the Lease term.

27.   The landlord's rights for tenant's broken promises include the right to

all lost rent and other damages or costs we may incur because of your broken promises. These costs may include the expenses of a lawyer, if we hire one, to the extent permitted by law. They may also include the costs of retaking possession of the Dwelling and, if necessary, the costs of redecorating or making repairs. […] You will pay us interest at the rate of 1½ % per month on any amount (other than as otherwise expressly provided in this Lease) which is unpaid 30 days after we notify you of the amount.

[Ex. 7, § 13(c)].

28.   Section 25 of the Lease concerns personal property, and states that the landlord leases to the tenant "at no additional rental the personal property now located in the Dwelling and listed in the schedule, if any, attached to this Lease. Such schedule is to be part of this Lease and has been examined and approved by you and us". Section 25 further provides that "[a]t the end of the term, you shall return said personal property in as good conditions as it is now, except for normal wear and tear." [Ex. 7, §25(a), (e)].

-8-

29.   Under § 32 of the Lease, the tenant had the option of extending the Lease on a month to month basis for the monthly rental of $14,500 provided there was no default under the Lease and written notice of the intent to extend was given to the landlord by November 5, 2005. [Ex. 7, § 32].

*c. The Wolf Tenancy*

30.   Wolf understood that the Lease was for a one year period with an option to extend. Although she intended to stay at the premises for two years, this intention was never communicated to plaintiff, Gary Ryder, or any of plaintiff's representatives.

31.   Wolf never bothered to read or review the Lease until the spring of 2006.

32.   At the time Wolf took possession of the premises, she did not know she was prohibited from making alterations or painting without written consent.

33.   After taking possession of the premises, Wolf made alterations and modifications to the interior of the premises, and painted many or all of the rooms, without the written consent of the landlord. Plaintiff's exhibits 9, 11-18, 21, and 23 are true and complete copies of invoices rendered by contractors with respect to alterations and modifications made by the tenant.

34.   The alterations made by Wolf included changing the kitchen countertops to granite countertops because she deemed the existing countertops unsanitary; painting the kitchen cabinets

-9-

white; changing the backsplash in the kitchen; replacing kitchen appliances; painting most of the walls white or pale yellow so they would match her furnishings and linens; changing light fixtures, bathtubs and toilets in various bathrooms throughout the house; and installing closets in the bedrooms. [doc. # 222, Tr, 1/26/2012, Wolf at 128-132].

35.  Wolf spent over $120,000 on alterations, testifying she "had a standard of living that had to be upheld." [doc. # 222, Tr., 1/26/2012, Wolf at 133].

36.  Wolf paid to the landlord those sums set forth in plaintiff's exhibit # 10 on or about the respective dates set forth on the checks which make up that exhibit. Wolf made no payments to the defendant not reflected in that exhibit, other than the security deposit. [Stip. ¶ 7].

37.  Wolf made timely payment of rent for the months from January through November of 2005 in the amount of $14,000 per month.

38.  Wolf made payments, in the amount of $15,000 per month, from April 2006 to August 2006, in accordance with a Housing Court Stipulation between the parties dated April 6, 2006, a copy of which is marked as plaintiff's exhibit # 44.

39.  Wolf did not pay rent from December 2005 through March 2006.

*d. Michael Carter*

40.   Michael Carter was a friend and former employee of Gary Ryder. Michael Carter oversaw the landscaping crew, snow removal, and other property maintenance during the Wolf tenancy.

41.   Carter frequently visited the home during the Wolf tenancy and was present when Wolf was undertaking the alterations to the property.

42.   Carter was appointed trustee of SFSK Trust sometime in March 2006.

43.   Carter was not available to testify at trial.

*e. Summary Process*

44.   On or about June 6, 2005, landlord served a Notice to Quit Possession on Wolf through her representative Evan Snapper, identifying 23 Lease violations, including unapproved alterations to the premises. [Ex. 31].

45.   On June 7, 2005, Steven Scheno faxed a letter to Snapper, identifying additional Lease violations related to consent for inspection of the dwelling. Scheno stated, "Kindly advise your client that she has until June 13, 2005 to vacate the Dwelling due to the incurable lease violations." [Ex. 33].

46.   On June 20, 2005, Scheno faxed a second letter to Snapper, identifying yet additional Lease violations including the landlord's inability to access the property. Scheno states, "It is my understanding that you have barred the landlord from performing

-11-

several of these duties and obligations and have told landlord employees to 'not go on the property'." [Ex. 36].

47.   On or about November 18, 2005, landlord served a second Notice to Quit on Wolf. A copy of the Notice to Quit is marked as defendant's exhibit # 102. [Stip. ¶ 8].

48.   At the time she received the Notice to Quit, Wolf had not exercised her option to extend her tenancy under § 32 of the Lease. [Stip. ¶ 9].

49.   From the time she received the Notice to Quit on November 18, 2005, through April 6, 2006, Wolf did not make any rent payments to landlord. [Stip. ¶ 10; Ex. 102].

50.   Landlord commenced a summary process action dated November 30, 2005, and withdrew that action on December 20, 2005. True and complete copies of the summary process complaint and the withdrawal are marked as plaintiff's exhibits # 39 and # 32, respectively. [Stip. ¶ 11].

51.   On or about February 20, 2006, landlord served another Notice to Quit on Wolf. A copy of the Notice to Quit is marked as plaintiff's exhibit # 43. [Stip. ¶ 12].

52.   On or about February 25, 2006, landlord commenced a summary process action against Wolf in Connecticut state court, Housing Session at Norwalk. [Stip. ¶ 13].

53.   On April 6, 2006, landlord and Wolf entered into a Stipulation in the summary process action pursuant to which Wolf

-12-

agreed (1) to vacate the premises by no later than August 31, 2006 and (2) to pay reasonable use and occupancy of $15,000 per month for the months of April through August 2006. A true and complete copy of the Stipulation is marked as plaintiff's exhibit # 44. [Stip. ¶ 15].

54.  Wolf made payments to landlord in accordance with the Stipulation of $15,000 per month for the months of April through August 2006. [Stip. ¶ 16].

55.  The landlord has not remitted to Wolf any portion of the security deposit that Wolf delivered to the landlord, as shown in plaintiff's exhibit # 8, and has not paid Wolf any interest on the security deposit. [Stip. ¶ 21].

56.  No written request was made by Wolf or her representatives for return of the security deposit. [Stip. ¶ 22].

*f. Vacating the Home*

57.  Sometime in the summer of 2006, before Wolf vacated the home, Wolf's attorneys, Thomas Goldberg and Alexandra Dolger, scheduled a walk-through of the property. The purpose of the walk-through was to identify work that needed to be done on the house to restore the house to its pre-tenancy condition. Present at the walk-through were Attorney Dolger, Michael Carter for the plaintiff, Attorney Jim Lenes for the plaintiff, and Mark Bebey, the contractor who had done the alterations for Wolf.

-13-

58.   On August 25, 2006, following the walk-through, Attorney Goldberg sent a letter to Attorney Lenes, to inform him that Wolf was preparing to vacate the property and to update Lenes regarding "restorations and to inquire  about the colors and finishes that your client requests for the rooms that Ms. Wolf has re-painted." [Ex. 48]. It was further noted that,

> Ms. Wolf paid for substantial upgrades to the kitchen, replacing antiquated appliances with new, state-of-the-art appliances, and installing high-grade counters. Similarly, she upgraded the dilapidated bathrooms by installing new toilets, counters, and tile. It makes no sense that she should remove these upgrades and 'restore' the house to its earlier, less attractive condition. Nor is it credible that the upgrades have in any way diminished the appearance or style of the house.
>
> [Ex. 48].

59.   Wolf's representatives never heard back from plaintiff or plaintiff's representatives regarding preferred paint colors or restoring the house to the original condition.

60.   On or before August 31, 2006, Wolf vacated the premises. [Stip. ¶ 17].

61.   Wolf did not repaint the home to its preexisting colors.

62.   Wolf did not restore the kitchen to its preexisting condition.

63.   Wolf did not restore the bathrooms to their preexisting condition.

-14-

64.   Plaintiff did not rent the property again until March 2011.

*g. Other litigation*

65.   On or about September 13, 2006, the Trust filed a claim with its insurer, AIG Insurance Company ("AIG" or "AIU").

66.   In a letter dated January 23, 2007, AIG declined coverage on all of plaintiff's claims except the claims for damages with regard to the driveway, driveway gate, siding of the house, and water leakage in the master bedroom. AIG stated that its investigation,

> did determine that some damage exists at the premises that the trust did not discover until it regained possession on August 31, 2006, for which coverage exists under the AIU Policy. Specifically, we have determined that the damaged siding in the rear of the insured premises was not damaged by an unauthorized modification made by Ms. Marburg Wolf but rather through the negligence of someone working at the premises. Such damage is covered. Similarly, the damages to hardware on the driveway gate appear to have been caused by the negligence of some worker or contractor and therefore are covered [. . .] We shall mail under separate cover a check in sum of $21,138.37 for these damages. Your acceptance of this check is without prejudice to your further pursuit of your claim although for the reasons discussed above AIU Insurance Company does not believe that it has any further liability to the Trust.

[Ex. 107, at 11, ¶ G].

67.   In 2006, plaintiff recovered $21,138.37 from AIG which covered plaintiff's claim for damages to the property, including damage to the driveway, the front gate and the master bedroom ceiling. [Ex. 107; Tr., 1/25/2012, Ryder testimony, at 45].

-15-

68.  On May 7, 2009, following negotiations and a declaratory judgment action brought by AIG in New York seeking a declaration that no claims were covered under the policy, the Trust and AIG entered into a Settlement Agreement and Releases, pursuant to which AIG agreed to pay the Trust the sum of $88,000 to settle all remaining claims. A true and complete copy of the Settlement Agreement and Releases is marked as defendant's exhibit # 108. AIG subsequently remitted the payment due under the settlement agreement. [Stip. ¶ 18].

69.  On or about December 12, 2011, the Trust entered into an agreement with the Estate of Sally O'Brien to settle and resolve the claim asserted by the Trust against the Estate in the Eighth Count of the Amended Complaint. Pursuant to the settlement, the Estate of Sally O'Brien paid the Trust the sum of $20,000 in settlement of the Trust's claim. A true and complete copy of the Settlement Agreement is marked as defendant's exhibit # 178. [Stip. ¶ 19].

II.     CONCLUSIONS OF LAW

   *a. Plaintiff's Claims*

Count 1- Breach of Contract- Unpaid Rent

   1.   Wolf owes plaintiff rent from December 2005 to March 2006.

   2.   Both parties agree that Wolf owes $14,000 for December 2005 rent.

   3.   At issue is the amount of rent owed for January through March 2006, with plaintiff claiming it is entitled to double rent, $28,000, plus interest pursuant to § 9(c)(ii) of the Lease, and defendant claiming that landlord is entitled to use and occupancy of $14,500 a month because landlord terminated the Lease when it served the notice to quit on November 18, 2005. [Ex. 102].

   4.   A "notice to quit will not terminate a lease if the notice itself is invalid. Indeed, it is self-evident that if the notice is invalid, then the legal consequence of 'termination' arising from the service of a valid notice does not result." Bargain Mart, Inc. v. Lipkis, 212 Conn. 120, 134 (1989). See also City of Bridgeport v. Barbour-Daniel Electronics, Inc., 16 Conn. App. 574 (1988).

   5.   The November 18, 2005 Notice to Quit was invalid under Conn. Gen. Stat. § 47a-23(b) as it did not track the statutory language of Conn. Gen. Stat. § 47a-23(a). Thus, it did not terminate the Lease.

-17-

6.    The Lease term ended on December 31, 2005 and Wolf was a holdover tenant as of January 1, 2006, pursuant to § 9 of the Lease.

7.    As a holdover tenant, Wolf was subject to all of the other terms and conditions in the Lease. [Ex. 7, § 9(c)].

8.    Defendant's third affirmative defense asserts that the holdover provision of the Lease, § 9(c)(ii), is an unenforceable penalty provision.

9.    "A contractual provision for a penalty is one the prime purpose of which is to prevent a breach of the contract by holding over the head of a contracting party the threat of punishment for a breach.... A provision for liquidated damages, on the other hand, is one the real purpose of which is to fix fair compensation to the injured party for a breach of the contract. In determining whether any particular provision is for liquidated damages or for a penalty, the courts are not controlled by the fact that the phrase liquidated damages or the word penalty is used. Rather, that which is determinative of the question is the intention of the parties to the contract. Accordingly, such a provision is ordinarily to be construed as one for liquidated damages if three conditions are satisfied: (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount

-18-

stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract." Kovacs Const. Corp. v. Water Pollution and Control Authority of City of New Haven, 120 Conn. App. 646, 662-663 (2010) (quoting American Car Rental, Inc. v. Commissioner of Consumer Protection, 273 Conn. 296, 306-307 (2005)).

10.   "As in this case, most of the litigation concerning liquidated damages clauses arises in the context of an affirmative action by the party injured by breach to enforce the clause in order to recover the amount therein stipulated. In such cases, the burden of persuasion about the enforceability of the clause naturally rests with its proponent." Ferraina v. Industrial Health Care Co., No. CVH-6214, 2000 WL 226707, n. 5 (Conn. Super. Ct. Feb. 20, 2000) (quoting see, e.g., Norwalk Door Closer Co. v. Eagle Lock & Screw Co., 153 Conn. 688; Vines v. Orchard Hills, Inc., 181 Conn. 501, 511 (1980)).

11.   Here, plaintiff has not met its burden that the provision is enforceable as a liquidated damages provision. There is no evidence in the record with regard to any of the three conditions necessary in order to qualify as a liquidated damages provision. As such, the double rent provision is an unenforceable

penalty provision, and plaintiff is entitled to the reasonable value of rent during the holdover period.

12.   Plaintiff terminated the Lease pursuant to its February 20, 2006 Notice to Quit. [Ex. 43].

13.   The Court finds that reasonable rent for January and February 2006 and use and occupancy for March 2006 is $15,000 a month, consistent with the Housing Court Stipulation which set reasonable use and occupancy at $15,000 a month.

14.   Plaintiff is entitled to $59,000 for unpaid rent.

15.   Plaintiff seeks interest for unpaid rent pursuant to § 2 of the Lease.

16.   Plaintiff is entitled to interest pursuant to § 2 of Lease for the months of December, January, and February, during which time the Lease was in effect.

17.   Table 1 represents interest owed by Wolf on unpaid rent through September 2012. Through September 2012, Wolf owes plaintiff $54,045.00 in interest on unpaid rent. Plaintiff shall be entitled to an additional $660 a month in interest for every additional month past September 2012, until the judgment is paid.

Table 1 – Interest on Unpaid Rent

| Month | Rent/Use and Occupancy | Interest Rate | Monthly Interest | Number of Months (through Sept. 2012) | Total Interest (through Sept. 2012) |
|---|---|---|---|---|---|
| Dec-05 | $ 14,000.00 | 0.015 | $  210.00 | 87 | $  18,270.00 |
| Jan-06 | $ 15,000.00 | 0.015 | $  225.00 | 80 | $  18,000.00 |
| Feb-06 | $ 15,000.00 | 0.015 | $  225.00 | 79 | $  17,775.00 |
| Mar-06 | $ 15,000.00 | 0 | $    – | 0 | $    – |

| Total Unpaid Rent: | $ 59,000.00 | Monthly Interest: | $  660.00 | Total Interest (through September 2012): | $  54,045.00 |
|---|---|---|---|---|---|

| | | | Total Unpaid Rent and Interest: | $  113,045.00 |
|---|---|---|---|---|

18.   The Court awards plaintiff damages of $113,045 for unpaid rent and interest through September 2012.

Count 2- Breach of Contract- Unauthorized Modifications to Premises

19.   Plaintiff seeks damages for the modifications Wolf made to the premises without the written consent of the landlord.

20.   Defendant claims that plaintiff is estopped from making these claims because defendant relied on the actual or implied authority of Michael Carter to approve of the changes made to the premises on behalf of the landlord.

21.   The Court finds that during the tenancy, Carter did not have authority, actual or implied, to bind plaintiff. The Court credits Wolf's testimony that Carter visited the property

frequently, but the evidence reveals that his role was more of groundskeeper and friend of Ryder's and not somebody with authority to act on behalf of or bind the landlord. Moreover, with regard to the alterations specifically, the Court finds that Wolf never consulted with or sought approval from Carter prior to beginning the alterations and that Wolf did not rely on any representations or acquiescence by Carter with regard to the alterations made.

22.   Defendant materially breached § 10(a)-(c) of the Lease by making unauthorized modifications to the premises.

23.   Although defendant initiated efforts at the end of the Lease term to restore some or all of the property to its pre-tenancy condition, the Court credits Ryder's testimony that these efforts came too late in the tenancy.[5] Wolf, who had already overstayed the Lease, was expected to turn over the property by August 31, 2006 in accordance with the Housing Court stipulation. The first effort to ascertain what needed to be changed came at the end of July 2006, during the walk-through. Given the tenant's breach, the landlord had no obligation to provide tenant with any

---

[5] "There was no confidence whatsoever, that in ostensibly five additional nights of tenancy, or occupancy, or possession, that anyone, including the Army Corps of Engineers, could have restored the house to the original condition, even with regard – even if you just want to keep it in a narrow corridor, provincially to paint." [doc. # 220, Tr. 2/6/2012, Ryder at 7].

information or to assist tenant in restoring the home to its pre-tenancy condition.

24.   Section 13(c) of the Lease provides that plaintiff will pay tenant for "all lost rent and other damages or costs we may incur because of your broken promises."

25.   Plaintiff carries the burden of proof with regard to the amount of damages to be awarded. Plaintiff has the burden of proving damages to a reasonable certainty. <u>Leisure Resort Technology, Inc. v. Trading Cove Associates</u>, 277 Conn. 21, 35 (2006).

26.   The Court finds that defendant is liable to the plaintiff for the cost of:

(a)   Repainting the house to its pre-tenancy condition including the repainting of the kitchen cabinets.[6]

(b)   Replacing the granite countertops in the kitchen.

(c)   Repainting the kitchen floor from oak to pickled white color.

(d)   Restoring the mirror in "Frankie's" bathroom and powder room.

(e)   Replacing toilets in the powder room and master bathroom.

---

[6] The Court credits the testimony of DeBeradinis, who conceded the kitchen cabinets could be sanded down and repainted to their original pickled finish, which would have been less expensive. [doc. # 223, Tr. 1/27/2012, DeBeradinis at 89].

(f)   Replacing bathtub, tile, toilet, sink and vanity in guest bathroom and double boy's bathroom.

(g)   Replacing/Restoring kitchen appliances.

27.   The Court awards plaintiff damages in the amount of $161,200 for the items enumerated that have been proved to a reasonable degree of certainty, as reflected in Table 2. [See Exs. 55, 66].

Table 2- Cost of repairs to restore home to pre-tenancy condition

| Item | Cost |
|---|---|
| Repainting the house to its pre-tenancy condition including, the repainting of the kitchen cabinets. | $    92,000.00 |
| Replacing kitchen granite countertops | $     9,500.00 |
| Refinishing kitchen floor from oak to pickled white color | $     4,000.00 |
| Bathroom restorations | $    48,700.00 |
| Kitchen appliances | $     7,000.00 |
| TOTAL | $   161,200.00 |

28.   With regard to lost rent incidental to defendant's violation of § 10 of the Lease, plaintiff chose to take the property off the market for four years and claims lost rent of over $800,000. However, plaintiff had a duty to mitigate his damages and the maximum amount of rent allowable under the Lease is 60 days after vacating. [Ex. 7, § 13(c)]; Newington v. General Sanitation Service Co., 196 Conn. 81, 85-86 (1985); Camp v. Cohn, 151 Conn. 623, 627 (1964); 3 Restatement (Second), Contracts § 350 (1979).

-24-

29.   The Court finds that, given the post-tenancy condition of the home, plaintiff is entitled to lost rent for two months pursuant to § 13(c) of the Lease. The Court awards plaintiff lost rent for two months in the amount of $30,000. Plaintiff is not entitled to interest pursuant to § 13(c), because notice was never given to defendant of the amount.

Count Three- Breach of Contract- Damage to the Property

30.   Plaintiff seeks damages for alleged damage to the property by Wolf in violation of § 4(f) of the Lease, including damage to the gate, driveway, exterior and interior walls, trees and landscaping.[7]

31.   With regard to the gate, defendant testified that in January 2006 she had an accident where she hit black ice and went straight into the gate, damaging the gate and her car. [doc. # 222, Tr., 1/26/2012, Wolf at 204-205].

32.   There is insufficient evidence that the damage to the gate was done "willfully or negligently", as required by § 4(f) of the Lease.

---

[7] As noted in the findings of fact, prior to the $88,000 settlement plaintiff reached with AIG in 2009, in 2006 plaintiff recovered $21,138.37 from AIG that covered plaintiff's claim of damages to the property, including damage to the driveway, the front gate and the master bedroom ceiling. [Ex. 107; doc. # 221, Tr., 1/25/2012, Ryder at 45].

-25-

33.   There is insufficient evidence linking defendant to the other items of damage which plaintiff attributed to defendant. With regard to the grounds maintenance specifically, this was the landlord's responsibility under § 3(f), and the Court finds insufficient evidence for plaintiff's claim that groundskeepers were denied access to the property.

34.   Plaintiff has not carried its burden with regard to count three of the Amended Complaint.

Count Four-Breach of Contract- Loss of Personal Property

35.   Plaintiff seeks damages for the alleged loss of personal property in violation of § 4(f) of the Lease.[8]

36.   There is conflicting evidence with regard to the items of personal property that were left on the premises for use by the tenant. And there is insufficient evidence that defendant destroyed or permanently removed the items claimed by plaintiff.[9]

37.   The Court finds for defendant on Count Four.

_____

[8] Plaintiff has abandoned its claims under § 25 of the Lease, which references the leasing of personal property and a schedule which is not part of the Lease or the record before the Court.

[9] Moreover, even had plaintiff sustained its burden, plaintiff has failed to prove the value of these items. Although damages may be based on reasonable and probable estimates, the Court may not award damages on the basis of guess, speculation or conjecture. See Leisure Resort Technology, Inc. v. Trading Cove Associates, 277 Conn. 21, 35 (2006).

Count Five- Breach of Contract-Additional Lease Violations

38.   The Court finds that plaintiff has not met its burden of proof concerning additional alleged Lease violations, including that Wolf caused work to be conducted on the premises in violation of relevant building, housing and fire codes in violation of § 4 of the Lease; that Wolf barred the plaintiff and its agents from entering the property to conduct reasonable inspections of the premises in violation of § 15 of the Lease; that Wolf barred the plaintiff and its agents from entering the property to maintain the specimen plantings at the premises in violation of the Lease Rider/Addendum; that Wolf barred the plaintiff and its agents from entering the property to show the premises to prospective tenants in violation of §§ 15(e) and 15(d) of the Lease; that Wolf failed to maintain and keep in operation smoke and/or fire alarm systems at the premises in violation of § 4(m) of the Lease; that Wolf allowed paint, solvents and other commercial grade chemicals to be dumped into the premises' plumbing fixtures in violation of § 4(d) of the Lease; that Wolf improperly used the heating system by leaving doors and windows open during cold weather in violation of § 4(e) of the Lease; and, that Wolf changed the exterior locks to the dwelling in violation of § 10 of the Lease.

39.   Therefore, the Court finds in defendant's favor on Count Five.

-27-

Count Six- Conversion/ Count Seven- Intentional Tort

40.  To establish liability for conversion, an intentional tort, the plaintiff must prove four essential elements by a fair preponderance of the evidence:

(1) that the property at issue belonged to the plaintiff;

(2) that the defendant exercised control over the plaintiff's property which deprived the plaintiff of the property either permanently or for an indefinite period of time;

(3)  that the defendant's conduct was unauthorized; and

(4)  that the defendant's conduct caused harm to the plaintiff. See Label Systems Corp. v. Aghamohammadi, 270 Conn. 291, 329 (2004).

41.  The measure of damages recoverable by plaintiff in an action for conversion, where the plaintiff has alleged a total loss of ownership rights in the converted property, is the fair market value of the property at the time and place it was converted, together with simple interest running forward from the day of the wrongful act. Healey v. Flammia, 96 Conn, 233 (1921); Bacchiochi v. Colon, Civ. No. 095005190-S, 2012 WL 5158253 (Conn. Super. Ct. Nov. 30, 2010).

42.  The Court finds, as with count four, that there is insufficient evidence that the personal property claimed by plaintiff was left at the premises for the tenant, and that the tenant permanently deprived plaintiff of the property following the tenancy.

43.  As such, the Court finds for defendant on plaintiff's claim for conversion and intentional tort.

-28-

*b. Defendant's Counterclaims*

Breach of Lease- § 7; Violation of Conn. Gen. Stat. §§ 47a-21(d)(1), (d)(2), (h)(1) and (h)(4)

44.  Plaintiff deposited Wolf's security deposit in a business checking account for the SKSK Dependent Trust (the "trust account").

45.  During the tenancy, withdrawals and deposits were made from the trust account.

46.  In October 2005, the trust account had an ending balance of $271.86. [Ex. 40].

47.  In December 2005, the trust account had an ending balance of $197,328.11.

48.  Plaintiff breached § 7 of the Lease by failing to deposit Wolf's security deposit in an escrow account.

49.  The Court finds that plaintiff did not violate Conn. Gen. Stat. §§ 47a-21(d)(1) and (d)(2) by failing to return the security deposit and interest following the termination of the tenancy, given that plaintiff was entitled to deduct from the security deposit "any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations."

50.   The Court finds that plaintiff violated Conn. Gen. Stat. § 47a-21(h)(1) by failing to deposit Wolf's security deposit in an escrow account.

51.   The Court finds that plaintiff did not violate Conn. Gen. Stat. § 47a-21(h)(4) which prohibits landlord to withdraw funds from the escrow account because the security deposit was never placed in an escrow account to begin with, in violation of § 47a-21(h)(1).

52.   The Court finds that defendant did not suffer any monetary loss as a result of plaintiff's breach of § 7 of the Lease and violation of Conn. Gen. Stat. § 47a-21.

53.   The Court takes judicial notice of the deposit index for calendar year 2005 which was .53%, as set forth on the Connecticut Department of Banking website. See http://www.ct.gov/dob/cwp/view.asp?a=2247&q=299048 (last visited May 9, 2012).

54.   Defendant would have accrued $148.40 in interest on her $28,000 security deposit for 2005.

55.   Defendant is entitled to a set-off for her security deposit plus interest of $28,148.40.

CUTPA

56.   Violations of the Landlord-Tenant Act, General Statutes § 47a-1 et seq., may be a basis for a finding of a violation of CUTPA. Conaway v. Prestia, 191 Conn. 484, 493 (1983).

57.   The Court found that plaintiff's failure to maintain Wolf's security deposit in an escrow account was a violation of C.G.S. § 47a-21(h)(1). Such a violation may support an award of punitive damages if landlord's conduct reveals reckless indifference to tenant's rights or intentional and wanton violation of those rights. See Gargano v. Heyman, 203 Conn. 616, 622 (1987). The Court finds that the facts and circumstances of the instant case do not support an award of punitive damages or attorney's fees.

58.   The Court further notes that Wolf has failed to prove any ascertainable loss from plaintiff's failure to segregate the security deposit funds into a separate escrow account. See C.G.S. § 42-110g(a), ("[a]ny person who suffers any ascertainable loss of money or property ... as a result of ... a method, act or practice prohibited by section 42-110b, may bring an action ... to recover actual damages.").

Double Recovery

59.   Defendant claims that any award to plaintiff must be reduced by the amounts plaintiff received from AIG and Sally O'Brien through the settlement of those related claims. Defendant argues that a reduction is necessary to prevent plaintiff from double recovery for the same item of damages.

60.   Indeed, a plaintiff "may be compensated only once for his just damages for the same injury." Gionfriddo v. Gartenhaus Cafe, 211 Conn. 67, 71 (1989).

61.   With regard to Sally O'Brien, the Court finds that a reduction by the settlement amount is not warranted. Plaintiff's claim against Sally O'Brien alleged conspiracy in assisting Wolf to undertake the unauthorized alterations to the home. Although pled as a separate and distinct cause of action against Sally O'Brien, Connecticut does not recognize civil conspiracy as an independent tort. Macomber v. Travelers Property and Casualty Corp., 277 Conn. 617 (2006). Rather, the cause of action may be asserted for damages caused by the conspiracy to commit a substantive tort. Here, the conspiracy must consist of some tortious conduct by which O'Brien induced Wolf to breach the Lease. The elements of a tortious interference claim differ from the elements for a breach of contract claim, and the damages awarded under the respective claims seek compensation for a different injury. See Direct Mail Jobs, LLC v. Hughes, Civ. No.

-32-

HHBCV 085009794, 2011 WL 3672086, at *5 (Conn. Super. Ct. 2011)
("The gravamen [sic] of an action for civil conspiracy is that
there must be some underlying tort in which the conspirator
participates that causes damage to the plaintiff. Breaching a
simple employment contract is not a criminal or an unlawful act;
it is not a tort."); Herman v. Endriss, 187 Conn. 374, 376-77
(1982) ("A plaintiff may recover damages for tortious interference
with a contract not only where the contract is thereby not
performed ... but also where the interference causes the
performance to be more expensive or burdensome ...") (Citation
omitted; internal quotation marks omitted.). As such, defendant is
not entitled to a reduction of or credit against the damages owed
to plaintiff.[10]

---

[10] The case of Drummond American LLC v. Share Corp., Civ. No.
3:08cv1665 (MRK), 2010 WL 2574096, at *1 (D. Conn. April 9, 2010)
is illustrative. In Drummond, plaintiff asserted a breach of
contract claim against defendant Mahoney and tortious interference
and CUTPA claims against defendant Share Corporation. The Court
granted plaintiff summary judgment on the breach of contract
claim, with the remaining claims, including damages for the breach
of contract claim, going to trial before a jury. The jury returned
a verdict in plaintiff's favor on all counts assessing separate
damages against defendant Mahoney for the breach of contract claim
and defendant Share Corporation for the tortious interference and
CUTPA claim. Notably, the jury was instructed to award damages on
the tortious interference and CUTPA claims together to minimize a
double recovery given that the claims were based on the same
misconduct. No such limiting instruction was given on the amount
that could be awarded to plaintiff for the breach of contract
claim.

62.   With regard to the AIG settlement, the Court finds that a reduction by the settlement amount is warranted. Plaintiff's allegations against AIG arise out of its claim for damages under the property's home owner's insurance policy and AIG's disclaimer of coverage. Plaintiff alleged that AIG's "decision to disclaim coverage is undertaken in bad faith and in an effort to avoid the obligations it undertook when entering into a contract with the plaintiff and in accepting the plaintiff's insurance premiums." [doc. # 50, Amended Third Party Complaint, ¶ 10].

63.   The settlement agreement between AIG and plaintiff dated May 7, 2009 states, that AIG "shall pay the sum of eighty eight thousand dollars and no cents ($88,000.00) [hereinafter "the Payment"] to "Steven Scheno and SFSK Dependent Trust and mail it to 345 Round Hill Road to settle the Claim." The Claim is defined in the settlement agreement as the September 13, 2006 claim SFSK filed with AIG "seeking coverage for the alleged damages arising from Wolf's tenancy". [Ex. 108].

64.   Here, defendant, who was not a party to the settlement agreement between the Trust and O'Brien, has met her burden that plaintiff's  settlement with AIG was for same injury for which she is liable, namely the damage to the property. U.S. Indus. v. Touche Ross & Co., 854 F.2d 1223, 1262 (10th Cir. 1988). Plaintiff failed to meet its burden of showing that the settlement does not provide him with a double recovery. Id. The Court rejects

-34-

plaintiff's argument that the settlement was intended to avoid litigation threatened by Ryder. The language of the settlement agreement unequivocally states that the $88,000 settlement is intended to compensate plaintiff for his claims under the home owner's insurance policy for damage to the property caused by the Wolf tenancy. As such, defendant is entitled to a credit of $88,000.

Total Damages

Table 3- Itemization of Damages

| Damages awarded to plaintiff | | Offsets | | |
|---|---|---|---|---|
| Unpaid Rent | $    59,000.00 | Security Deposit | $    (28,000.00) |
| Interest on Unpaid Rent through Sept. 2012 | $    54,045.00 | Security Deposit Interest | $    (148.40) |
| Costs of repairs to restore home to pre-tenancy condition | $    161,200.00 | Settlement with AIG | $    (88,000.00) |
| Lost rent | $    30,000.00 | | |
| Total Damages: | $    304,245.00 | Total Offsets: | $    (116,148.40) |

| TOTAL DAMAGES MINUS TOTAL OFFSETS: | $    188,096.60 |
|---|---|

III.     CONCLUSION

For the reasons stated, judgment shall enter in favor of plaintiff on Count One for breach of contract as to unpaid rent and Count Two for breach of contract as to unauthorized modifications, and in favor of the defendant on her counterclaims for breach of contract with regard to the security deposit and violation of Conn. Gen. Stat. § 47a-21(h)(1). As set forth in Table 3, Itemization of Damages, Judgment shall enter in favor of plaintiff against defendant in the amount of $188,096.60 for plaintiff's claims minus the security deposit, security deposit interest and defendant's settlement with AIG.

If the parties are unable to agree on the attorney's fees due plaintiff under the Lease, plaintiff may file an application with supporting documentation. The application will be filed on or before November 1, 2012.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [doc. # 176] on November 2, 2011 with appeal to the Court of Appeals.

Entered at Bridgeport, this 28th  day of September, 2012.

_____
                         /s/
                         HOLLY B. FITZSIMMONS
             UNITED STATES MAGISTRATE JUDGE

-36-